UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT ASHLAND

**KATHY HELMS,**

     **Plaintiff,**

**V.**

**BOYD COUNTY SHERIFF'S DEPARTMENT, et al.**

     **Defendants.**

**CIVIL ACTION NO. 0:18-CV-112-KKC**

**OPINION AND ORDER**

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the motion for summary judgment (DE 91) and motion to strike plaintiff's experts (DE 99) filed jointly by all Defendants. For the following reasons, the Court will grant Defendants' motion for summary judgment and deny as moot the motion to strike.

## I.    Background

Plaintiff Kathy Helms is the guardian of her son, Brian "Rusty" Helms, and has been substituted as the plaintiff in this action. This is because, after Rusty filed this action, the Boyd County District Court adjudged him incompetent to handle his own affairs, both personal and financial. That court then appointed Kathy as Rusty's guardian. (DE 47-1, Mem.; DE 92-1, Ex. 1, 2.) To avoid confusion, the Court will refer to Kathy Helms as Plaintiff in this opinion and will refer to Brian as "Rusty."

Kathy stated in a declaration to this Court that Rusty should not be placed in the courtroom because "his disruptive behavior could prove problematic in court and could unfairly affect his case and his rights should [he] not be able to control himself in front of

a jury or the judge or could unfairly prejudice the rights of the defendants." (DE 47-3.) Rusty was not deposed by any party, and Plaintiff has agreed that he will not testify at any trial in this action. (DE 116, Reply at 7, n.2.)

On October 30, 2017, Rusty's father, Brian D. Helms, petitioned the Boyd District Court to involuntarily hospitalize Rusty under KRS § 202A. (DE 92, Helms Dep. at 105-09, DE 92-1, Ex. 4.) The Court will refer to Rusty's father as Mr. Helms. In support of the petition, Mr. Helms stated that Rusty had generalized anxiety, post-traumatic stress disorder and "other mental health issues," and that Rusty had become "extremely paranoid & delusional," irrational, aggressive, hostile, and was threatening to harm his parents and other family members. Mr. Helms stated that the family was "worried for their safety and [Rusty's] safety." (DE 92-1, Ex. 4.) The Boyd District Court granted the petition that same day, ordering that Rusty be taken into custody for evaluation of his mental health status at Pathways, a mental healthcare provider. (DE 92-1, Ex. 4; DE 92, Helms Dep. at 112.)

On November 29, 2017, Sergeant Carl Hall of the Boyd County Sheriff's Office sent two deputies to Rusty's home to take him into custody for the purpose of transporting him to Pathways. (DE 93, Hall Dep. at 40- 41.) It is unclear why the sheriff's office did not take Rusty into custody until nearly a month after the court order was issued. Regardless, the deputies took Rusty into custody "without incident" and took Rusty to Pathways for the evaluation. (DE 27, Amended Complaint ¶ 10; DE 112, Mem. at 2.)

Sergeant Hall also went to Pathways. (DE 93, Hall Dep. at 41.) Prior to doing so, he reviewed the 202A petition filed by Rusty's father. (DE 93, Hall Dep. at 69-70.) At

Pathways, Rusty and Sergeant Hall had a conversation about people they knew in common. (DE 93, Hall Dep. at 44-45.) Then Rusty began saying things that did not make sense to Hall about digging for Egyptian artifacts. (DE 93, Hall Dep. at 45.) Rusty also admitted to Hall that he used meth and told Hall that he had been practicing how to disarm police officers. (DE 93, Hall Dep. at 45, 47-48.)

The evaluator told Sergeant Hall that Rusty would likely have to go to Eastern State Hospital. Rusty overheard that statement, and he jumped up, said he was not going and took off his sweatshirt. (DE 93, Hall Dep. at 50.) When the evaluator handed Hall the "paperwork" for the hospitalization, Rusty jumped up again, said he was not going, and tried to walk past Hall. (DE 93, Hall Dep. at 52.) Hall tried to "de-escalate" the situation. He coaxed Rusty into getting in the law enforcement vehicle by saying he was going to try to talk the evaluator out of the order to go to Eastern. (DE 93, Hall Dep. at 52-53.) After taking Rusty to the vehicle, Sergeant Hall went back into Pathways for a bit and then went back to the car to tell Rusty that he had to go to Eastern State. Rusty began hitting his head on the inside of the car and threatened to sue various people including Sergeant Hall, Rusty's parents, and Pathways. (DE 93, Hall Dep. at 53-54.)

Sergeant Hall drove Rusty back to the sheriff's office so that Rusty could be transferred to Lexington by a transport deputy in a transport car. (DE 93, Hall Dep. at 54.) On the way, Sergeant Hall called the office and was informed that Deputy BJ Kimmle, who was at the Boyd County Justice Center, could transport Rusty to Lexington. (DE 93, Hall Dep. at 55.) Hall pulled up at the sheriff's office and waited for Deputy Kimmle to arrive. (DE 93, Hall Dep. at 55.) This was when he noticed that Rusty was on his phone talking to Plaintiff. (DE 93, Hall Dep. at 56-57.) Hall did not know that Rusty

3

had his phone with him before that. (DE 93, Hall Dep. at 56.) He made a mental note to instruct Kimmle to take the phone when they transferred Rusty to Kimmle's transport vehicle. (DE 93, Hall Dep. at 57.)

Sergeant Hall waited on Deputy Kimmle at the sheriff's office. After some time had passed and Kimmle still had not arrived, Hall drove to the Justice Center where he found Kimmle. (DE 93, Hall Dep. at 58-59.) Up to this point, Plaintiff does not allege any problems with the officers' conduct.

The problems, according to Plaintiff, arise when Deputy Kimmle arrived at the patrol car, opened the car door and asked Rusty for his phone. (DE 93, Hall Dep. at 59.) Plaintiff alleges that, at this point, the deputies pulled Rusty "out of the car, forced him to the ground while continuing to strike him, and subsequently restrained him on the ground." (DE 27, Amended Complaint ¶ 28.) Plaintiff alleges that Deputy David White also arrived on the scene and tased Rusty. (DE 27, Amended Complaint ¶ 28.) The officers then restrained Rusty in handcuffs and ankle restraints and placed him in the transport vehicle. (DE 27, Amended Complaint ¶ 37.)

Unbeknownst to any of the officers or Rusty, Plaintiff remained on the phone with her son throughout the allegedly unconstitutional events. She went to the sheriff's office, where she informed Sheriff Bobby Jack Woods about what she heard over the phone. (DE 27, Amended Complaint ¶ 38.) Plaintiff alleges that, after the altercation, Deputy Kimmle began driving Rusty to Eastern State Hospital. However, after speaking with Plaintiff, Sheriff Woods told Deputy Kimmle to return to the office. (DE 27, Amended Complaint ¶ 41.) Deputy Kimmle did so. Ultimately, a different deputy drove Rusty to Eastern State. (DE 27, Amended Complaint ¶ 43.)

On Rusty's behalf, Plaintiff asserts three constitutional claims under 42 U.S.C. § 1983 against Sergeant Hall and Deputies Kimmle and White: violations of Rusty's Fourth Amendment rights against excessive force; his First Amendment rights against retaliation for exercising his right to protected speech; and his rights to equal protection of the laws. Plaintiff also asserts § 1983 claims against Boyd County Fiscal Court, the Boyd County Sheriff's Department and Sheriff Woods for failure to train and for unconstitutional customs, policies, and practices. Finally, Plainitiff asserts claims against the Boyd County Fiscal Court and the Boyd County Sheriff's Department for disability discrimination under the Americans with Disabilities Act.

## II.      Analysis

### A.  Constitutional Claims

#### 1)  Excessive Force Claim against the Officers

The parties agree that Plaintiff's excessive force claim is governed by the Fourth Amendment. While most commonly applied in criminal settings, the Fourth Amendment also "applies in the civil setting to seizures of individuals for psychiatric evaluations or involuntary confinement." *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir.2008) (citing *Monday v. Oullette*, 118 F.3d 1099, 1102–04 (6th Cir.1997)). "[T[he Fourth Amendment reasonableness standard generally applies any time a government official seizes a free citizen with the purpose of potentially creating an involuntary custodial relationship with the State." *Id*.

Under the Fourth Amendment, the lawfulness of the officers' conduct is judged based on whether the officers acted objectively reasonable considering the circumstances confronting them, regardless of the officers' intent or motivation. *Graham v. Connor*, 490

U.S. 386, 397 (1989). "This standard contains a built-in measure of deference to the officers' on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The Court uses a balancing approach when analyzing excessive-force claims. *See Graham*, 490 U.S. at 396. "This approach requires courts to weigh an officer's reasons for the force against an arrestee's interest in avoiding it." *Chaney-Snell v. Young*, 98 F.4th 699, 716 (6th Cir. 2024). Among the factors that the Court should consider in this balancing is "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

"Courts must undertake this balancing from the perspective of a reasonable officer who knows that dangerous encounters often require split-second decisions." *Chaney-Snell*, 98 F.4th at 716 (internal quotations and citation omitted). "And courts must engage in an objective review of all the circumstances, not a subjective review of an officer's motives." *Id*. The Court cannot use "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97. Instead, the Court must analyze the officer's actions from "the perspective of a reasonable officer on the scene." *Id*.

If the plaintiff alleges excessive force based on different actions by the police during a single incident, the incident must be analyzed "in segments" to assess the

reasonableness of the officer's actions. *Morrison v. Bd. Of Trustees of Green Twp*., 583 F.3d 394, 401 (6th Cir. 2009). Plaintiff alleges in the complaint that two events violated Rusty's constitutional right against excessive force. The first such event is when Sergeant Hall and Deputy Kimmle allegedly pulled Rusty "out of the car, forced him to the ground while continuing to strike him, and subsequently restrained him on the ground." (DE 27, Amended Complaint ¶ 28.) The second allegedly unconstitutional event is when Deputy White tased Rusty. (DE 27, Amended Complaint ¶ 28.)

Defendants are entitled to summary judgment if, under the undisputed facts and the plaintiff's version of any material disputed facts, defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008); *Rimco, Inc. v. Dual-Tech, Inc*., No. 3:21-CV-313, 2022 WL 4545608, at *1, n.1 (E.D. Tenn. Sept. 28, 2022) ("As required, this Court accepts undisputed facts as true. In deciding a motion for summary judgment as to which the parties dispute any material facts, the Court must view the disputed evidence in the light most favorable to the party responding to the motion—here, Plaintiff—and draw all reasonable inferences in that party's favor.")

Here, the only people present for the allegedly unconstitutional acts were the officers and Rusty. As discussed, Rusty was never deposed, and Plaintiff has agreed not to call him to testify at trial. (DE 116, Reply at 7, n.2.) Thus, Plaintiff's argument in her response brief that the officers' "factual assertions [are] highly disputed by the witnesses" is simply wrong.  (DE 112, Response at 16.) The officers are the only eyewitnesses, and they testified consistently about the relevant events. As will be discussed further below, Plaintiff overheard portions of the events on her cell phone, but what she heard does not

7

contradict the officers' description of Rusty's actions prior to the officers' application of force.

As to the officers' version of the first event, Sergeant Hall testified that, when Deputy Kimmle leaned into the car at the Justice Center and asked Rusty for his phone, Rusty said something that Hall could not hear and then pulled back and assumed a position "like he was going to kick" Deputy Kimmle. (DE 93, Hall Dep. at 59.) Hall ran to the passenger side of the car, opened the door, and could see Rusty lying down on the seat. The officers tried to get Rusty's arms behind him. Rusty was "hollering and screaming, stop, quit. . ." and the officers were telling him to put his hands behind his back and to drop the phone. (DE 93, Hall Dep. at 59-60.) Hall testified that, when Rusty refused to comply, he gave Rusty three compliance strikes "right in the scapula." He again instructed Rusty to put his hands behind his back, but Rusty would not comply. (DE 93, Hall Dep. at 60.)

Deputy Kimmle then pulled Rusty out of the car. Rusty "was on the asphalt on his back, and he is kicking and swarping at [Kimmle], trying to get a hold of him." (DE 93, Hall Dep. at 61.) The officers were trying to handcuff Rusty, but he was resisting. (DE 93, Hall Dep. at 81-82.) This is when Deputy White arrived and tased Rusty. (DE 93, Hall Dep. at 61.) The taser gun was a "drive stun," which "gives a mild electric shock, milder that what it was if you had been hit with the probes." (DE 93, Hall Dep. 85.) Deputy Kimmle cuffed Rusty, and the officers stood him up. (DE 93, Hall Dep. at 61.) The officers were then able to place Rusty in Deputy Kimmle's transport car. (DE 93, Hall Dep. at 78.)

Deputy Kimmle testified consistently with Sergeant Hall. He testified that he approached Sergeant Hall's vehicle at the Justice Center and asked for Rusty's phone. Rusty said, "Fuck you, fuck them, fuck this." (DE 95, Kimmle Dep. 55.) Then Rusty "scooted back in the seat, rared his foot back to kick me" and "dropped his right hand down like he was going to swing. He had his fist curled." (DE 95, Kimmle Dep. at 55.) Rusty was "screaming and hollering" and "started to move his legs." (DE 95, Kimmle Dep. at 55.) Kimmle collapsed down on Rusty's legs. (DE 95, Kimmle Dep. at 55.) Kimmle testified that Rusty kept fighting, squirming around, and "screaming and hollering." He testified that this is when Sergeant Hall came to the passenger side and applied compliance strikes. (DE 95, Kimmle Dep. at 55-56, 60.)

Deputy Kimmle testified that the officers could not gain control of Rusty because he was "fighting and resisting." (DE 95, Kimmle Dep. at 56.) He testified that he pulled Rusty out of the car and both he and Rusty fell to the ground. Rusty landed on his back and was "swinging and raising his foot to kick me." (DE 95, Kimmle Dep. at 56.) Deputy Kimmle grabbed his legs and Sergeant Hall grabbed one arm and was trying to grab the other. Rusty rolled to his stomach and "was trying to fight to get up." (DE 95, Kimmle Dep. at 56, 67.) This was when Deputy White tased Rusty. (DE 95, Kimmle Dep. at 56.) Deputy Kimmle handcuffed Rusty and stood him up. He and the officers then placed Rusty in the transport car. (DE 95, Kimmle Dep. at 56-57.)

The only other officer present was Deputy White, who testified that he was returning to the Justice Center after getting lunch that day when he saw Deputy Kimmle enter one side of a vehicle and Sergeant Hall run to the other side of the vehicle. (DE 96, White Dep. at 50, 52.) He testified the officers were "giving directions for the subject to

9

quit resisting" but Rusty "would not honor any of the commands given" and "would not quit resisting." (DE 96, White Dep. at 52.) He saw Sergeant Hall give "palm heal strikes" between Rusty's shoulder blades, but Rusty was "still actively resisting." (DE 96, White Dep. at 53, 77.) Deputy White told Kimmle that they needed to get Rusty out of the car so they could control him. (DE 96, White Dep. at 53.) He testified that Kimmle got Rusty out of the car, but "they were still struggling on the ground," with Kimmle at Rusty's feet and Sergeant Hall at his head. (DE 96, White Dep. at 53.) Deputy White testified that Rusty was still "actively and physically resisting any directions" by the officers to "quit fighting, quit resisting." (DE 96, White Dep. at 75-76.) Rusty was "still kicking and fighting and trying to get away." (DE 96, White Dep. at 90.) Deputy White testified that this is when he tased Rusty with a "drive stun." (DE 96, White Dep. at 53-54.) Deputy White testified that, as soon as he used the taser, Rusty became compliant, and Deputy White shut the taser off. (DE 96, White Dep. at 90.) Normally, the taser would run for five seconds, but Deputy White shut it off after two seconds because Rusty was already compliant. (DE 96, White Dep. at 90.)

Thus, the only eyewitness testimony to the events at issue is consistent. Pursuant to that testimony, no reasonable juror could conclude that the officers used excessive force in attempting to transfer Rusty from Sergeant Hall's vehicle to Deputy Kimmle's transport vehicle. While Rusty was not being arrested and had not committed any crime, the officers reasonably perceived Rusty to present an immediate threat to the officers' safety. While in Sergeant Hall's car, Rusty made movements indicating that he was going to kick and hit Deputy Kimmle. Rusty refused to obey the officers' commands and was actively resisting the officers' attempts to obtain his cell phone, to transfer him to a

10

transport vehicle, and to restrain him. *Graham*, 490 U.S. at 396. Balancing these factors, the amount of force the officers applied was reasonable. The officers applied minimal force given the circumstances – compliance strikes, forcing Rusty from the car and to the ground, attempts to control Rusty's arms and legs, and employing a taser with a milder electric shock for two seconds rather than the normal five.

Plaintiff concedes in her response that "Rusty argued with the officers about handing over the phone." (DE 112, Response at 16.)  Plaintiff denies that Rusty otherwise resisted the officers attempts to transfer him to Deputy Kimmle's transport vehicle, but Plaintiff was not there. Sergeant Hall and Deputy Kimmle were, and they both testified that Rusty resisted their efforts to obtain his cell phone and to transfer him to the transport car.

Plaintiff disputes in her response that Rusty "made verbal threats to kick and punch" Deputy Kimmle. (DE 112, Response at 17.) But neither Sergeant Hall nor Deputy Kimmle testified that Rusty made such *verbal* threats. They testified that Rusty pulled his leg back like he was going to kick Deputy Kimmle and dropped his right hand back with a closed fist like he was going to hit the deputy. Plaintiff's testimony about what she heard over the phone does not contradict the officers' descriptions of Rusty's actions.

Plaintiff argues in her response brief that, prior to the officers' application of force, Rusty was "simply awaiting transport and talking to [his] mother on the telephone." (DE 112, Response at 17-18.) She cites no evidence to support that. The testimony by the only eyewitnesses to the events establishes that Rusty was disobeying the officers and actively resisting their efforts to restrain him and transfer him to the transport vehicle.

The officers acted reasonably in pulling Rusty out of Sergeant Hall's vehicle. It was necessary for the officers to gain control over Rusty before they could transfer him to the transport vehicle. The officers reasonably concluded that they had to pull Rusty from the vehicle to do so. He was fighting them in the vehicle and made movements like he would hit or kick Deputy Kimmle. The officers first attempted to restrain Rusty with minimal force while he was still in the vehicle: Sergeant Hall applied compliance strikes and Deputy Kimmle attempted to restrain Rusty's legs. (DE 95, Kimmle Dep.at 55.) Despite these efforts, Rusty continued to resist the officers.

While Plaintiff alleges in the complaint that the officers forced Rusty to the ground and continued to strike him, the only evidence before the Court is that the officers pulled Rusty out of the car and attempted to restrain him on the ground because he was resisting them and disobeying their commands. These actions were reasonable.

As to the second event, Deputy White testified that he tased Rusty because, even while on the ground, Rusty continued kicking and resisting the officers. Deputy White's use of a taser was reasonable in this situation. *See Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012). ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him.") Moreover, Deputy White employed a taser with a milder electric shock for only two seconds instead of the normal five seconds.

Plaintiff argues that her testimony about what she heard over the phone is sufficient to present to a jury the issue of whether the officers used excessive force in transferring Rusty to the transport car. Nothing that she reports hearing, however, contradicts the officers' version of events. Most importantly, nothing she heard

contradicts the officers' testimony that Rusty was resisting the officers and disobeying their commands prior to their application of any force.

Plaintiff testified that Rusty called her when he was in the sheriff's office parking lot asking her to tell the officers not to take him to Eastern State Hospital because "he viewed that hospital as only people who go there is crazy, and he didn't want to be thought of as being crazy." Rusty wanted Plaintiff to tell the officers that "he wasn't crazy and . . . didn't need to go to a hospital for crazy people." (DE 92, Helms. Dep. 124.) Then, Plaintiff heard sounds indicating the vehicle was moving. Plaintiff told Rusty she would see him later that evening and told him she was going to hang up the phone. She testified that Rusty thought she hung up the phone, and she heard him tell the officers that she hung up, but she did not actually hang up. (DE 92, Helms. Dep. 124.)

She heard one officer say, "Hang up the phone and give me your effing phone." (DE 92, Helms Dep. 157.) She heard Rusty say, "Can't I talk to my mom?" (DE 92, Helms Dep. 157.) She testified that this is when she "heard scuffling and him screaming out in pain and begging them to stop." (DE 92, Helms Dep. 124, 157-58.) She heard one of the officers say, "he's a crazy psycho – crazy effing psycho and you've had this coming to you all morning." (DE 92, Helms. Dep. 124-25.) She testified that the officers used more profanity and Rusty continued screaming in pain and yelling for the officers to stop. (DE 92, Helms. Dep. at 125.) She testified that she heard one officer say, "Tase the motherfucker." (DE 92, Helms. Dep. at 139.)

As to the language and insults used by the officers, they were unprofessional. The Court understands that it would have been terribly difficult for Plaintiff to hear. Such language does not, however, constitute excessive force. Moreover, Plaintiff could not

identify which officers she heard speaking. (DE 92, Helms Dep. at 132-33.) As to Plaintiff's testimony that she heard Rusty screaming and crying out, that is consistent with the officers' testimony. They testified that Rusty was screaming throughout the relevant events.

Plaintiff argues that her testimony is proof that Rusty "made no threats or hostile overtures." (DE 112, Response at 24.) Plaintiff, however, can testify only as to what she heard. She did not see any of the events. Thus, she cannot testify and did not testify that Rusty made no threatening movements or hostile overtures to the officers as the officers testified.

Plaintiff argues that, at the time Deputy White employed the taser, "Rusty was already contained, face down on the pavement and unable to move as two much larger deputies were holding him down." (DE 112, Response at 19.) She cites no evidence to support that description of events. Deputy White testified that, at the time he employed the taser, Rusty was still "actively and physically resisting any directions" by the officers to "quit fighting, quit resisting." (DE 96, White Dep. at 75-76.) Rusty was "still kicking and fighting and trying to get away." (DE 96, White Dep. at 90.) Sergeant Hall and Deputy Kimmle testified consistently. Deputy Kimmle testified that Rusty rolled to his stomach and was "trying to fight to get up," and this was when Deputy White tased him. (DE 95, Kimmle Dep. at 56, 67.) That is the only evidence before the Court as to Rusty's actions at the time that Deputy White tased him.

Plaintiff testified that, after she ceased hearing any more scuffling, she heard sounds indicating that Rusty was again in a moving car. Then she heard Rusty ask for something to drink, and the officer responded, "I'm taking you straight to Eastern and

14

dropping you off. If you move, I'll put a bullet in your head." (DE 92, Helms Dep. at 127-28.) Deputy Kimmle stated that, after the application of any force, on the way to Eastern State, he told Rusty to stop moving or he would "put a bullet in his ass." (DE 95, Kimmle Dep. at 69.) Regardless of exactly what Deputy Kimmle stated, he testified that made the statement as "verbal intimidation" because Rusty was still "thrashing around." (DE 95, Kimmle Dep. at 69-70.) Rusty had removed his seatbelt and was attempting to get his handcuffs in front of him. (DE 95, Kimmle Dep. at 69-70.) Importantly, the statement was made after any of the alleged excessive force, and it is only a statement. There is no allegation that Deputy Kimmle or any other officer used a firearm during the relevant events.

For all these reasons, the Court will enter summary judgment in favor of the officers on the excessive force claim.

### 2) § 1983 First Amendment Retaliation Claim against Hall and Kimmle

Plaintiff asserts a First Amendment retaliation claim against Sergeant Hall and Deputy Kimmle based on their actions of pulling Rusty from the back seat of the cruiser and forcing him to the ground. (DE 112, Response at 24.)

On a summary judgment motion, a First Amendment retaliation claim is analyzed under a burden-shifting framework. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and, (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at

least in part by his protected conduct." *Id.* (citing *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)).

Here, there is no evidence that Rusty was engaged in constitutionally protected speech at the time that Sergeant Hall and Deputy Kimmle pulled him from the car, forced him to the ground and restrained him. Plaintiff asserts that Rusty was exercising his "constitutionally protected right to question law enforcement officers about why he was being detained" and his constitutional right to make "the same inquiry" with Plaintiff on the cell phone. (DE 112, Response at 24.)

But Rusty had no constitutionally protected right to engage in a cell phone conversation with Plaintiff while in a law enforcement vehicle being involuntarily hospitalized. Plaintiff cites no law establishing that right. And Plaintiff points to no evidence that, just prior to the officers' application of force, Rusty was asking the officers why he was being detained. The Court found no such evidence in the officers' deposition or Plaintiff's deposition.

Even if Rusty was asking that question, however, Plaintiff has not presented sufficient evidence to create an issue of fact as to what caused the officers to physically restrain and tase him. For the causation element, "[a] plaintiff has the initial burden to establish that there is a genuine issue of material fact over whether the plaintiff's protected expression was a 'motivating' factor in the defendants' adverse action." *Good v. Walworth*, No. 21-1429, 2023 WL 9320823, at *3 (6th Cir. Aug. 22, 2023), *cert. denied*, 144 S. Ct. 1071 (2024). "If the plaintiff does so, the defendants can still rebut the plaintiff's claim by proving "that they would have taken the same action even if the plaintiff had not spoken – namely, that there is an absence of but-for causation." *Id.*

16

(internal quotations and citation omitted). "To carry this burden, the defendants must affirmatively introduce evidence of such weight that no rational jury could disagree with it." *Id*. (internal quotations and citation omitted).

Plaintiff has produced no evidence that any speech by him was a motivating factor in the officers' application of force.  Moreover, as already discussed, the officers have presented unrefuted evidence that, at the time of the relevant actions by the officers, Rusty was disobeying their commands and actively and physically resisting their attempts to control him and transfer him to the transport vehicle. In the face of that evidence, no rational juror could find that the officers were motivated even in part by Rusty asking any questions. Instead, the overwhelming evidence is that the officers would have taken the same actions even if Rusty had never spoken. No rational juror could find otherwise. Accordingly, the Court will enter summary judgment in favor of Sergeant Hall and Deputy Kimmle on the First Amendment retaliation claim.

### 3)  Equal Protection Claim against Hall and Kimmle

Plaintiff asserts that Sergeant Hall and Deputy Kimmle violated his rights under the Equal Protection Clause by treating him differently than other similarly situated individuals because he has a mental illness. Plaintiff asserts that the officers "applied a beating to him that was motivated, at least in part, by their disdain for people such as himself who had a mental disability." (DE 112, Response at 28.) The Equal Protection Clause of the Fourteenth Amendment prohibits government action that "1) burdens a fundamental right, 2) targets a suspect class, or 3) intentionally treats one differently than others similarly situated without any rational basis for the difference." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012) (citation omitted).

"Disabled persons are not a suspect class for purposes of an equal protection challenge." *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 457 (6th Cir. 2008). Government classifications based on disability violate the Equal Protection Clause only if they lack a rational relationship to a legitimate governmental purpose. *Id*. To survive summary judgment on this claim, Plaintiff must produce evidence that 1) Hall and Kimmle intentionally treated Rusty differently – because he is disabled – "than similarly situated students who were like him in all relevant respects," and (2) these defendants' actions "bore no rational relationship to a legitimate governmental purpose." *Id*.

For her equal protection claim, Plaintiff argues that the reason the officers pulled Rusty from the car, forced him to the ground, and restrained him was because of Rusty's mental illness. The sole evidence she points to in support of that assertion is her testimony regarding the crass language she heard over the phone such as the officers calling Rusty "a crazy effing psycho." Unrefuted evidence establishes, however, that Rusty was actively resisting the officers inside the car and disobeying their commands and that he continued to do so after the officers pulled him from the car and forced him to the ground. No rational juror could find that, in the face of that evidence, the officers acted, not to restrain Rusty, but because he was mentally ill.

Moreover, Plaintiff does not even allege that the officers treated Rusty differently than any similarly situated person without a mental illness. She points to no evidence of any person without a mental illness at all, much less one who actively resisted the officers and disobeyed their commands but was not forcibly restrained by the officers. Thus, summary judgment in the officers' favor on the Equal Protection claim is appropriate. *See Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008) ("[W]e need not

18

apply the rational basis test because the plaintiffs have failed to demonstrate the existence of any similarly situated landowners.")

### 4)  Constitutional claims against the officers and Sheriff Wood in their official capacities

Plaintiff asserts constitutional claims against Sergeant Hall, Deputies Kimmle and White, and Sheriff Woods in both their official and individual capacities. "A suit against an individual 'in his official capacity' is essentially a suit brought directly against the local government unit." *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir.1989). A § 1983 action "normally should be brought against either or both of two defendants: the local public official in his individual capacity and the local government which employs or is sought to be held responsible for the acts of that public official." *Id.* at 1244-45. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "There is no longer a need to bring official-capacity actions against local government officials. . . . " *Id*. at 167 n. 14.

Defendants construe the constitutional claims against the individuals as claims against the county. (DE 91, Mem. at 9.) Accordingly, the Court will dismiss the constitutional claims against the officers in their official capacities and will treat these claims as claims against the county.

### 5)  Constitutional Claims against Sheriff Woods

With Count 4 of the complaint, Plaintiff asserts all three of the constitutional claims against Sheriff Woods in his individual capacity. "Section 1983 liability will not be imposed solely upon the basis of respondeat superior." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Plaintiff must present evidence that Sheriff Woods "encouraged

the specific incident of misconduct or in some other way directly participated in it." *Id*. At a minimum, she must show that Sheriff Woods "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id*.

Plaintiff does not allege or present evidence that Sheriff Woods directly participated in the alleged constitutional violations. She does not allege or present evidence that Sheriff Woods was even present for any of the allegedly unconstitutional conduct. Nor does she present any evidence from which it could be inferred that Sheriff Woods authorized, approved, or knowingly acquiesced in any constitutional violations.

Plaintiff alleges that Sheriff Woods provided inadequate training and supervision. (DE 27, Complaint, ¶ 122.) The sheriff cannot, however, be liable in his individual capacity under § 1983 for a failure to train law enforcement officers. Such a claim "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey v. Campbell Cnty.*, Tenn., 453 F. App'x 557, 563 (6th Cir. 2011) (quoting *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008)). Thus, even if Plaintiff did adequately allege that Sheriff Woods was a county policymaker and was deliberately indifferent to the need for officer training in a particular area, "he would be liable, if at all, in *his official capacity*, i.e., rendering the County liable." *Id*.

Accordingly, the Court will enter judgment in favor of Sheriff Woods in his individual capacity on all constitutional claims.

### 6) Constitutional Claims against Boyd County Fiscal Court and Boyd County Sheriff's Department

With Count 4 of the complaint, Plaintiff asserts § 1983 claims against Boyd County Fiscal Court and the Boyd County Sheriff's Department for unconstitutional customs, policies, and practices.

In her response brief, Plaintiff withdraws all claims against Boyd County Fiscal Court. Accordingly, the Court will dismiss those claims.

As to her claims against the Boyd County Sheriff's Department, the department is not a "person" subject to suit under § 1983. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("Since the Police Department is not an entity which may be sued, Jefferson County is the proper party to address the allegations of Matthews's complaint."); *Gambrel v. Knox Cnty., Ky.*, No. 17-184-DLB, 2018 WL 1457296, at *8 n.7 (E.D. Ky. Mar. 23, 2018) ("A county sheriff's department is not a 'person' subject to suit under § 1983 because municipal departments are not suable under § 1983."); *Ford v. Batts*, No. 5:17-CV-P94-TBR, 2018 WL 912609, at *3 (W.D. Ky. Feb. 15, 2018) ("The Ballard County Sheriff's Office is not a 'person' subject to suit under § 1983 because municipal departments are not suable under § 1983.")

Accordingly, the Court must dismiss the § 1983 claims against the Boyd County Sheriff's Department.

### 7) Constitutional Claims against the County

A county can be held liable for § 1983 claims only if "its policy or custom cause[d] the constitutional violation in question." *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005). It cannot be liable solely because an employee committed a constitutional violation. "While a municipality may be held liable under 42 U.S.C. § 1983

for a constitutional violation directly attributable to it, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees." *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir.1997).

Here, there is not sufficient evidence that any of the individual officers violated Rusty's rights under the Fourth Amendment, First Amendment, or Equal Protection Clause. The Sixth Circuit has held that a county cannot be held liable for its customs or policies if no individual suffered a constitutional violation. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation."); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470–71 (6th Cir. 2006) (explaining that, if a municipality's liability is alleged on the basis of the unconstitutional acts of its employees, then the plaintiff must show the employees inflicted a constitutional harm); *Scott v. Clay Cnty., Tenn.,* 205 F.3d 867, 879 (6th Cir.2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well.")

More recently, however, the Sixth Circuit, noting that its precedent "has not been a model of consistency on this point," stated, "it is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *Grote v. Kenton Cnty., Kentucky*, 85 F.4th 397, 414 (6th Cir. 2023).

In *Grote*, the court distinguished between two situations. Where there has been a finding that the plaintiff suffered no constitutional harm, then the county cannot be held liable for a constitutional violation; no such violation occurred. *Id*. In contrast, where there has been a finding that no individual employee is liable, but harm was nonetheless

22

"inflicted upon the victim," the municipality can be responsible for that harm. *Id*.
Examples of situations where a plaintiff could suffer a constitutional violation even
though no individual government employee could be held liable are when an individual
officer receives qualified immunity, *id*., or when a plaintiff claims that his constitutional
injury derived from systemic problems of "delays and confusion" in the county jail's
healthcare system even though no single doctor could be held responsible. *Id*. at 414-15.
In these situations, a constitutional violation still may exist, and the county may be
responsible for it.

Here, Rusty alleges that the individual defendants violated his rights under the
Fourth Amendment, First Amendment and the Equal Protection Claus. He alleges that the
county is liable for those violations because its custom or policy caused them. In this
situation, the county cannot be held liable for the constitutional violations if the officers
did not commit them. The Court has determined that there is not sufficient evidence that
any officer violated Rusty's constitutional rights.

Accordingly, judgment will be entered in favor of the county on all the
constitutional claims.

### B.  ADA Claim against the County

Finally, with Count 5 of the complaint, Plaintiff asserts that the Boyd County
Fiscal Court and the Boyd County Sheriff's Department violated Rusty's rights under
Title II of the Americans with Disabilities Act ("ADA"). As explained above, Plaintiff
has withdrawn all its claim against the fiscal court, and the Court will treat this claim
against the Sheriff's Department as a claim against the County.

Title II of the ADA provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To demonstrate a prima facie case under Title II of the ADA, a plaintiff must establish that (1) he has a disability; (2) he is otherwise qualified; and (3) he is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under a government program because of his disability. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023).

The first issue on this claim against the county is whether Plaintiff bases it on actions by the county itself or whether it is based a theory of vicarious liability. In her response brief, Plaintiff states that this claim is based on Sheriff Woods' act of rescinding policies and procedures to be used in "the handling of mentally incapacitated persons" without replacing those policies and procedures. (DE 112, Response at 31.) Plaintiff makes clear that her Title II claim against the county is not based on the county being vicariously liable for the actions by Sergeant Hall or the deputies. Instead, this claim is based on actions by the county itself. She explicitly states the claim is based on the county's failure "to set forth and maintain appropriate policies, practices or procedures to effectively handle and transport a mentally disabled person." (DE 112, Response at 30.)

The next issue is whether Plaintiff alleges that the county intentionally discriminated against Rusty or that it acted with deliberate indifference. *Finley v. Huss*, 102 F.4th 789, 820 (6th Cir. 2024) ("Plaintiffs may satisfy that final element using two different theories: failure to reasonably accommodate and intentional discrimination.")

Plaintiff does not allege or present any evidence that Sherrif Woods or the County intentionally discriminated against Rusty or any person when the sheriff rescinded the policy. Accordingly, she appears to allege that the county did not reasonably accommodate Rusty's disability by having a policy in place for taking custody of mentally ill individuals. She alleges that the reason that the officers applied force in taking custody of him was because of "the chaos" that arose after the sheriff rescinded the policy. (DE 112, Response at 32.)

For this claim, Plaintiff must present evidence of causation by showing that, "but for" Rusty's disability, he would have been able to access the services or benefits desired, namely being taken into custody without the force applied by Sergeant Hall and Deputies Kimmle and White. *Madej v. Maiden*, 951 F.3d 364, 373 (6th Cir. 2020). "[A] plaintiff invoking Title II's modification requirement must show that his disability is what causes his deprivation of the services or benefits desired." *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006).

As discussed, the evidence is overwhelming in this case that the reason the officers applied force was because Rusty was actively resisting them and disobeying their commands. In other words, even if Rusty were not mentally ill, the officers would have applied the same amount of force; and they would have applied the same amount of force to a person without a disability who was actively resisting and disobeying them. The Court will enter judgment in the county's favor on this claim.

## III.    Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1)   Defendants' motion for summary judgment (DE 91) is GRANTED;

25

2)  The Court will enter judgment in favor of Sergeant Hall, Deputy Kimmle, Deputy White, and Sheriff Woods in their individual capacities and in favor of Boyd County on all constitutional claims asserted against them;

3)  The Court will enter judgment in favor of Boyd County on the ADA Title II claim;

4)  The Court will dismiss all claims against Sergeant Hall, Deputy Kimmle, Deputy White, and Sheriff Woods in their official capacities and against the Boyd County Sheriff's Department and Boyd County Fiscal Court;

5)  Defendants' motion to strike the report and testimony of Plaintiffs' experts (DE 99) is DENIED as moot; and

6)  Judgment will be entered consistent with this opinion.

August 20, 2024

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY